UNITED STATES DISTICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JASON EHLERDING,               ) | |
| )                              | |
| Plaintiff,                  )  | |
| )                              | |
| v.                            ) | Cause No. 1:19-CV-00349-HAB |
| )                              | |
| KLOPFENSTEIN HOMEROOMS        ) | |
| FURNITURE, INC. d/b/a ASHLEY  ) | |
| HOMESTORES, and AUSTIN MILLS  ) | |
| )                              | |
| Defendants.              )     | |

**OPINION AND ORDER**

By his own admission, Plaintiff, Jason Ehlerding ("Ehlerding"), lives by the "better late than never" philosophy. He has not been on time since the fourth grade. That way of thinking found him on the receiving end of a termination decision from Defendant Klopfenstein Homerooms Furniture ("Klopfenstein") for, among other things, chronic tardiness. Ehlerding, however, believes discrimination was the motivation for his termination. He filed suit pursuant to 42 U.S.C. §1981 against Klopfenstein asserting race discrimination. Additionally, he asserted state law claims against both Klopfenstein and, his supervisor, Defendant Austin Mills ("Mills") for defamation and intentional infliction of emotional distress related to his post-termination failed restaurant endeavor.

Before the Court is Klopfenstein's Motion for Summary Judgement (ECF No. 37). Mills joined in Klopfenstein's Motion with respect to the state law counts against him. (ECF No. 41). Pursuant to Fed.R.Civ.P. 56, *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992) and *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982), Defendants filed the required notices informing Ehlerding of the

consequences of failing to respond to the motions for summary judgment. (ECF Nos. 40, 42). Despite these notices, Ehlerding failed to respond and thus, the motions are ripe for consideration.

## FACTUAL BACKGROUND[1]

Klopfenstein specializes in the home furnishings industry, with its corporate offices in Fort Wayne, Indiana. (Aff. of Loren Klopfenstein ¶ 3, ECF No. 39 at Ex. A). Klopfenstein serves Fort Wayne, Indiana and surrounding Northern Indiana and Northwest Ohio communities, including Mishawaka, Indiana. Loren Klopfenstein ("Loren") serves as the President of Klopfenstein and Austin Klopfenstein ("Austin") serves as the corporation's Vice President. (Aff. of Austin Klopfenstein ¶ 2, ECF No. 39 at Ex. B). Mills is the Regional Sales Director at the Mishawaka location and was Ehlerding's supervisor at the time of Ehlerding's separation from Klopfenstein. (Aff. of Austin Mills, ¶ 3; ECF No. 39, Ex. E)

Klopfenstein employed Ehlerding as a mattress specialist at the Mishawaka location from November 2015 through his termination on March 9, 2018. (Dep. of Ehlerding at 58, 60, ECF No. 39 at Ex. C). It is no stretch of the truth that prior to his employment with Klopfenstein, Ehlerding held in excess of 120 jobs and he testified he has been terminated from "hundreds" of jobs. (Ehlerding Dep. at 16, 28–29).

Ehlerding, who is biracial, refers to himself by an alias, "Jason S. Gray,"[2] and testified that he identifies as both African American and Caucasian. His government issued documents, including his birth certificate, driver's license, passport and gun permit, however, list his race as

---

[1] Both Klopfenstein and Mills submitted a statement of material facts with respect to the state law claims for defamation and intentional infliction of emotional distress allegations against them. However, because the Court declines to exercise supplemental jurisdiction over these state law claims, those facts have been omitted here.

[2] On his application for employment at Klopfenstein, Ehlerding listed his name as "Jason S. Gray." Loren and Austin only knew Ehlerding by his alias, Jason S. Gray.

"white." (Ehlerding Dep. at 124–126). Until served with this lawsuit, Klopfenstein was unaware that Ehlerding considered himself African American. (Austin Aff. ¶ 9).

Klopfenstein maintains an Attendance and Punctuality policy as part of its Employee Handbook. (ECF No. 39 p. 90) That policy provides, in pertinent part, "[r]egularity of attendance and punctuality is expected of each employee…Tardiness is defined as more than five (5) minutes late, without notice; excessive tardiness is defined a more than three (3) days in any ninety (90) day period." (*Id.*). Additionally, "unsatisfactory attendance" is listed as an offense considered sufficient grounds for disciplinary action, up to and including discharge. (*Id.* at 97).

To say that Ehlerding had a spotty attendance and work history would be generous – facts that Ehlerding unapologetically acknowledges. Ehlerding regularly received verbal and written warnings for being late and, it appears, his inability to be on time to work became so commonplace that Klopfenstein gave him an award for it at the annual employee recognition event. "[Y]es, I was late. I was late more than anybody else. And yes, I was given an award for it at the end of the year…I was late probably every day that I worked there, well probably minus 60 days " (Ehlerding Dep. at 69).[3] He was given warnings for a variety of attendance related matters ranging from missed work to tardiness on many occasions, some of which Ehlerding acknowledged and others he said he couldn't remember.[4] During his deposition, Ehlerding testified that he "would not be surprised" if counsel had twenty more written warning notices that he was issued for attendance/tardiness and he could "probably pull out fifty more." (*Id.* at 73).

It is unclear in the record why Klopfenstein tolerated this behavior from Ehlerding as long as it did. Perhaps it had to do with Ehlerding's sales performance. Ehlerding testified that while he

---

[3] As part of his award, Klopfenstein also gave Ehlerding an alarm clock.

[4] The record shows written warnings were issued on April 11, 2016, June 8, 2016, September 16, 2016, November 8, 2016, February 6, 2017, and February 13, 2017.

received the "late award," he was "proud of the fact that he was the best salesman" and received an award for that as well. (Ehlerding Dep. at 73). In his deposition, Ehlerding unabashedly claims that he was Klopfenstein's best performing salesperson. He testified as follows:

> Q. And all through 2017 you were given cou….uh, repeated warnings and counseling sessions concerning the fact that you were late?
>
> A. And still out performed everybody, sir. Yes, sir.
>
> Q. So you were given warnings repeatedly?
>
> A. Sir, I was given written warnings, I was given verbal warnings. I've been getting warnings every day since I've been in the fourth grade…

(Ehlerding Dep. at 74).[5]

Chronic lateness was not Ehlerding's only issue, it appears. Klopfenstein counseled Ehlerding – it says on at least two occasions – for public outbursts toward and in front of coworkers. While Ehlerding disputes that he was counseled for them, he acknowledged that he "might" have outbursts because he is "passionate":

> Q. Sir do you recall a counseling session where you were asked to discuss a public outburst that you had in front of your coworkers and your repeated tardiness?
>
> A. You mean like the one I just had?[6]
>
> Q. On March …
>
> A. I'm passionate.
>
> Q. …March 9th of …
>
> A. I'm passionate, sir.
>
> Q. …2018

---

[5] It appears Ehlerding was also late to his deposition.

[6] Ehlerding is referring to an exchange that occurred with opposing counsel during his deposition and immediately prior to this set of responses. Throughout his deposition, Ehlerding had difficulty answering questions and staying on topic. Ehlerding's then-counsel had to repeatedly focus him and direct him to answer the questions posed by opposing counsel.

>   A. I'm passionate. Yeah. You know what, I'm, I'm, I'll I'll be first one. You know, I plan on being the President of the freakin' United States one day. I'm passionate about everything that I do. So you know what, I might've had an outburst.

(Ehlerding Dep. at 86). The record also makes reference to a counseling session from Klopfenstein after an incident at the Red Roof Inn involving Ehlerding allegedly assaulting one of the Inn's employees. Ehlerding recalls the incident but not the counseling session. (*Id.* at 79).

By March 2018, Klopfenstein had enough. On March 8, Ehlerding had a "blowup" with one of his co-workers after the store closed. (Ehlerding Dep. 97). Ehlerding is seen on store video looking very upset and pacing back and forth. Ehlerding testified he was upset with a co-employee, Adrian Jefferson, who he believed had stolen commissions from him. (*Id.* at 99–100).

The next day, March 9, 2018, Mills, Vicki Neil, the General Manager, and Cole Chapman all met with Ehlerding to terminate him based on his excessive tardiness and his outbursts, which they deemed gross misconduct and harassment of employees. (Loren Aff. ¶ 14; Austin Aff. ¶ 15). Ehlerding denies the substance of the meeting but agrees that it occurred and that he recorded it. During this termination meeting Ehlerding began shouting at Mills and the police were called because, "they thought I was going to come back and do something." (Ehlerding Dep. at 101). Additionally, Ehlerding admits that he informed Mills, "if you want to fire me, fire me but I am not quitting." (*Id.* at 109). He followed this comment with "welcome to the world of lawsuits." (*Id.* at 110).

The following day Ehlerding sent a series of text messages to Austin that can accurately be described as a stream of consciousness rant. In those messages, Ehlerding stated, among other things, that he recorded his "unlawful termination" by Mills and set out his belief that his termination was racially motivated. (ECF No. 39 at 21–25). Ehlerding threatened to release the recording on social media and file suit in the text messages before attempting to negotiate a

settlement with Austin. He wrote "[s]ince I can't exactly come back to a company where I'll now be a target, we can easily settle this with some type of confidentiality non dislosure [sic] agreement to avoid making this public record with the labor board, Social Media, Tv, and Radio, other employees, or my attorney to avoid a drawn out lawsuit." (*Id.* at 25).

On March 16, 2018, Ehlerding sent Austin another text message with a more cordial tone. (ECF No. 39 at 26). In that message, Ehlerding requested a new meeting to "keep this out of court and for us to communicate to resolve this today." (Austin Aff. ¶ 20). Ehlerding also stated that he had a new job with Klopfenstein's competitor, Van's Furniture, in Auburn, Indiana and was scheduled to start March 17. (*Id.*). [7]

On March 19, 2018, Loren and Austin, along with Mills and Joanna Baker, Klopfenstein's HR Coordinator, met with Ehlerding at the distribution center in Fort Wayne, Indiana. During this meeting, Loren and Austin were concerned about Ehlerding going to Klopfenstein's competitor and offered to re-employ Ehlerding on a full-time basis in Mishawaka, where he had worked prior to his termination. (Austin Aff. ¶ 22; Loren Aff. ¶ 19). Ehlerding, however, only wanted a part-time position and claims he rejected the full-time offer because the Klopfensteins did not agree to purchase or rent a home for him in Mishawaka.[8] (Ehlerding Dep. at 199; Austin Aff. ¶ 19; Loren Aff. ¶ 22). Following the March 19 meeting, Mills contacted Ehlerding several times to ask if he would reconsider the job offer. (Loren Aff. ¶ 20). Ehlerding did not respond.

---

[7] Ehlerding routinely discussed his other business opportunities and/or made what appear to be peculiar claims. In his text messages to Austin, he asserts he "made [his] living in Hollywood half [his] life" (ECF No. 39 at 22) and he just "happens to be a million dollar writer" (*Id.* at 25). In his deposition, Ehlerding testified that he had business opportunities such as "being a national speaker" for Tony Robbins, "the world's most decorated speak[er]." (Ehlerding Dep. at 106). He further claimed that he had "forty opportunities" awaiting him and that he can do anything he wants because, "I'm the smartest man you've ever met in your life, and that's no BS." (*Id.* at 107)

[8] Ehlerding references in his text messages that he was living in a hotel.

Within a few days after Ehlerding's termination, several of Ehlerding's female co-workers reported that they believed they had been sexually harassed by Ehlerding during his employment at Klopfenstein. Several co-workers then came forward with written statements to Klopfenstein outlining the harassment they received from Ehlerding. During his deposition, Ehlerding was asked specific questions regarding a co-employee's assertion that she was told by Ehlerding that he "wanted to drink her bathwater." In response to the question he testified, "I'm a very flirtatious person. It is part of my nature … I might've been…could be accused of sexual harassment." (Ehlerding Dep. at 121). He further admitted that he told at least one co-employee that "she was good looking and that she had a place where he could use his lips." (*Id.* at 122).

Klopfenstein maintains an anti-harassment policy. (Loren Aff. ¶ 22 and Ex. D; Austin Aff. ¶ 25 and Ex. H). Ehlerding's harassing conduct toward female co-workers would have constituted grounds under that policy for immediate discharge and both Loren and Austin aver that they would have fired Ehlerding for violation of that policy. (Loren Aff. ¶ 23; Austin Aff. ¶ 26).

**APPLICABLE STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of

the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

That a motion for summary judgment is unopposed doesn't change the summary judgment standard, and the court still conducts "more than just a cursory review of the filings" and scrutinizes the movant's factual submissions in order to "determine that the motion is sound and within the parameters of the law." *Leal v. TSA Stores, Inc.*, No. 2:13 CV 318, 2014 WL 7272751 at *1 (N.D. Ind. Dec. 17, 2014). An unopposed motion does, however, "reduce the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). Mindful of these standards, the Court turns now to the substance of the case.

## DISCUSSION

In his Amended Complaint, Ehlerding asserts claims against Klopfenstein for race discrimination pursuant to 42 U.S.C. § 1981 as well as supplemental state law claims against both Klopfenstein and Mills for libel/defamation and intentional infliction of emotional distress.[9] As noted from the outset, Klopfenstein sought summary judgment on all allegations in the Amended Complaint and Mills joined in Klopfenstein's motion with respect to the state law claims asserted against him.

### A. Section 1981 Claims

Section 1981 of the Civil Rights Act of 1866 "protects the right of all persons 'to make and enforce contracts' regardless of race," and prohibits discrimination in the employment context. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411 (7th Cir. 2018) (quoting *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015); 42 U.S.C. § 1981(a)). The legal analysis for a discrimination claim brought under § 1981 is identical to a claim brought under Title VII. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

In an employment discrimination case, a plaintiff's claim survives summary judgment where the evidence permits "a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). When ruling on a summary judgment motion in an employment discrimination case, courts must consider the evidence as a whole, without regard to whether a particular piece of evidence constitutes "direct" or "indirect" evidence of discrimination. *See id.*

---

[9] These state law claims stem from events arising after Ehlerding's termination from Klopfenstein. Ehlerding asserts that Mills allegedly made defamatory/libelous statements on social media against his Kokomo, Indiana restaurant causing it to close. His Amended Complaint seeks to hold Klopfenstein liable under a *respondeat superior* theory since Mills worked for Klopfenstein at the time the statements were allegedly made.

That said, the *McDonnell Douglas* framework for analyzing discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894–95 (7th Cir. 2018). Under *McDonnell Douglas*, a plaintiff must show that: (1) he is a member of a protected class; (2) he performed reasonably on the job in accord with his employer's legitimate expectations; (3) he was subjected to an adverse employment action despite his reasonable performance; and (4) the employer treated similarly situated employees outside of the protected class more favorably. *Id.* If the plaintiff makes this *prima facie* showing, then the burden shifts to the employer to present a legitimate, non-discriminatory reason for the challenged employment action. *See McDonnell Douglas*, 411 U.S. at 802; *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). If the employer offers such a reason, the burden reverts to the plaintiff to show pretext, "or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment." *Barbera*, 906 F.3d at 629.

Klopfenstein asserts that regardless of whether the Court employs the *McDonnell Douglas* evidentiary framework or merely considers the entirety of the evidence outside of that framework, the result is the same; Ehlerding simply has presented no evidence from which a jury could conclude that his race caused his discharge. In fact, Klopfenstein argues that *all* the evidence points to non-discriminatory reasons for Ehlerding's termination and that none of the assertions Ehlerding made in his Amended Complaint are borne out in the record. This Court agrees.

For instance, Klopfenstein reiterates Ehlerding's admittedly long history of disciplinary issues for which he was repeatedly issued warnings and notices. Klopfenstein emphasizes Ehlerding's outbursts, including his eruption at the March 9, 2018, termination meeting where police were called to the scene. Klopfenstein also cites to a minimum of ten employee warnings in

a span of less than two years, while Ehlerding's own testimony suggests there were many more warnings than ten. As attendance and punctuality are listed as expectations of employment in the Employee Handbook, Klopfenstein argues that there is no question that Ehlerding was not meeting the company's legitimate expectations and that termination was appropriate.

For his part, Ehlerding admitted he was constantly late in violation of company policy, but indicated he felt emboldened to continue being late since, other than oodles of written warnings, he was never disciplined and he was Klopfenstein's highest sales performer. While it may or may not be true that Ehlerding was Klopfenstein's top performer (Klopfenstein is silent on this issue), Ehlerding produces no serious challenge to the termination reason given by Klopfenstein nor does he advance any evidence at all of a race-based motivation.

Klopfenstein seizes upon this absence of evidence by noting that Ehlerding has not shown that anyone at Klopfenstein had any knowledge that Ehlerding was African American or considered himself African American. Indeed, it is quite a leap of faith to not only claim, but prove, discriminatory motivation based on a protected characteristic when the employer is completely unaware of that characteristic. Ehlerding does not assert that Klopfenstein was aware of his race and admits that none of his government-issued documents classify him as African American, and that they all classify him as "white." This, Klopfenstein asserts, bolsters its position that there is no evidence that race played any role at all in Ehlerding's dismissal.

Further, to the extent Ehlerding considered himself black, Ehlerding presents no evidence that Klopfenstein treated similarly situated white employees with poor attendance and self-control issues more favorably that it treated him. Nor is there any evidence that the reason given for Ehlerding's termination – chronic tardiness and gross misconduct and harassment of employees – was pretextual or dishonest. As set out above, Ehlerding would be hard-pressed to challenge these

proffered reasons for his discharge given his repeated admissions in his deposition that he was late "probably every day he worked there." If that were not enough, he admitted that he had eruptions on the job and with coworkers because he's "passionate." Thus, the Court finds no evidence calling into question the legitimacy or the honesty of Klopfenstein's stated termination reasons.

For all these reasons, the Court concludes that on the record before it, no reasonable jury could conclude that Ehlerding's termination was driven by his race as opposed to his failure to meet the attendance and behavior standards of his employer. Klopfenstein's Motion for Summary Judgment is, therefore, GRANTED.[10]

### B. **Supplemental State Law Claims**

For the reasons stated above, the Court grants Klopfenstein's Motion for summary Judgment as to the claim under 42 U.S.C. § 1981. Because that disposition results in the dismissal of all claims over which the Court has original jurisdiction, see 28 U.S.C. § 1367(c)(3), the Court must address whether to retain jurisdiction over the state law claims for defamation and intentional infliction of emotional distress and rule on both Klopfenstein and Mills' Motions for Summary judgment on these claims.

As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all

---

[10] Even if the Court concluded that a genuine issue of material fact did exist warranting trial, the after-acquired evidence doctrine would limit Ehlerding's available damages. Under the affirmative defense for after-acquired evidence, "[a]n employer may be found liable for employment discrimination [based on the evidence before it at the time of the adverse action], but if the employer later -- typically in discovery -- turns up evidence of employee wrongdoing [that] would have led to the [same action], then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence." *Jones v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 75 F. Supp. 2d 885 (N.D. Ill. 1999) (quoting *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999). As set out in the facts, after Ehlerding's termination Klopfenstein discovered that Ehlerding had sexually harassed several employees in violation of its anti-harassment policy.

federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims"); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits"). Yet the court of appeals has discussed "three well-recognized exceptions" to the general rule that "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright*, 29 F.3d at 1252. As the court has explained, occasionally there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point to a federal decision of the state-law claims on the merits." *Id*.

The first example that the court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Wright*, 29 F.3d at 1251. That concern is not present here, however, because Indiana law gives a plaintiff three years from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. *See* Ind. Code § 34-11-8-1.

The second exception recognized in *Wright* applies when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." 29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir. 1986)). Here, although the Court has devoted significant resources to the disposition of the federal claim on summary judgment, it has not delved deeply into the state law claims. *See Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary

13

judgment, and so 'substantial judicial resources' have not yet been committed to the case"). Thus, while there clearly are instances in which "a district court should exercise supplemental jurisdiction over pendent state law claims for reason of judicial efficiency," *Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001), this is not one of them.

The third circumstance to which the court of appeals has pointed in which disposition of pendent state law claims may be appropriate "occurs when it is absolutely clear how the pendent claims can be decided." *Wright*, 29 F.3d at 1251. For example, "[i]f the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter claim to the state court." *Id*. In addition, if the state-law claims are "patently frivolous," they should be resolved right away in the federal court. *Id*. However, "[i]f the question whether a state-law claim lacks merit is not obvious, comity concerns may dictate relinquishment of jurisdiction." *Id*. The Court believes that Plaintiff's claims are likely without merit, but it ultimately concludes that it cannot say with certainty that they are patently frivolous. Plaintiff's state court claims arise out of facts distinct from the facts that gave rise to the now-defunct federal claims. Thus, both factually and legally, they are subject to distinct analysis best reserved for a state court forum. The Court may very well be delaying the inevitable but nonetheless concludes that relinquishment of jurisdiction is appropriate.

In sum, the Court concludes that none of the exceptions to the "usual practice" applies in this case. Accordingly, the Court denies Defendants' motions for summary judgment on the state law claims without prejudice and dismisses the state law claims with leave to refile in state court.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment (ECF Nos. 37, 41) are GRANTED in part and DENIED in part. Judgment is hereby entered in favor of Klopfenstein

on the claims arising under 42 U.S.C. § 1981 in Plaintiff's Amended Complaint. Defendants' Motions are denied as to Plaintiff's state law claims; those claims are dismissed without prejudice to refiling in state court.

So ORDERED on August 4, 2020

                                                s/ Holly A. Brady
                                                JUDGE HOLLY A. BRADY
                                                UNITED STATES DISTRICT COURT